GREEN, ADMINISTRATRIX, *v.* GREEN, GUARDIAN.

[No. 13,824.   Filed March 13, 1931.]

*Owen S. Boling, Chauncey W. Duncan* and *Morris, Barlow & Morris,* for appellant.

*Titsworth & Titsworth,* for appellee.

NEAL, P. J.—This was an action instituted by Maurice T. Green against his guardian, J. Cyrus Green, appellee herein, to set aside the final report, and for the discharge of J. Cyrus Green as guardian. To this complaint, appellee answered in two paragraphs, one of general denial and the second a special answer, to which special answer a reply of general denial was filed. Upon the issues thus formed, a trial was had, resulting in a judgment in favor of appellee, from which judgment, the plaintiff appealed, the error assigned being the court's action in overruling his motion for new trial, under which it is presented: (1) The decision is not sustained by sufficient evidence; (2) the decision is contrary to law; and (3) the court erred in denying the petition to set aside the final report. The death of Maurice T. Green having been suggested, Mary Green was substituted as party appellant as his administratrix.

The verified complaint to set aside the final report alleged, in substance: That, on March 8, 1921, J. Cyrus Green was appointed guardian of Maurice T. Green, then 17 years of age, and that the guardian thereafter collected approximately $9,000 in cash belonging to Maurice T. Green, as the proceeds of an insurance policy; that the guardian, by order of court, invested the money in United States bonds, but, thereafter, without an order of court, cashed the bonds and appropriated the money to his own use, or for the use of others than this ward, except $900 paid for board and $30 used for the benefit of the ward; that the guardian, on July 9, 1925, filed a

purported final report, which showed that he paid to Maurice T. Green the sum of $9,340.30, in notes, as the balance due the ward in full and final settlement, but, in truth, said sum was never so paid; that a receipt was attached to said report, purporting to have been signed by Maurice T. Green for notes of LaVanche E. Green, purporting to be worth $9,340.30; that, about June 16, 1925, the guardian went to see Maurice T. Green and handed him four notes, purporting to have been signed by LaVanche E. Green, payable to Maurice T. Green, and that, if the receipt was signed by him, it was signed in blank, and at that time he did not know that the receipt was in final settlement of the trust, and that nothing was said by the guardian concerning the receipt being in final settlement; that Maurice T. Green had never had any business experience and had full confidence in the guardian, who was his brother; that, at and prior to that time, LaVanche E. Green was wholly insolvent; that, attached to the final report is a purported request of Maurice T. Green, dated June 16, 1925, to the judge of the court for the approval of the report, but that he, Maurice T. Green, does not believe, nor has he any recollection, of signing the request and that, if he did sign the same, it was without the knowledge of its contents, and that he never saw the report to which the request was attached until March 25, 1926; that, on September 7, 1925, the final report was approved by order of court and the guardian discharged, but that, at that time, Maurice T. Green was not present in court, nor did he know the guardian had made a final report, nor know, until about March 23, 1926, anything about the action of the court; that he thereafter employed counsel and demanded a settlement from the guardian; that the guardian and a surety on the guardian's bond and LaVanche E. Green, mother of Maurice T. Green, afterwards proposed a compromise settlement of the liability by an offer to convey to Maurice T. Green

certain lands owned by LaVanche E. Green; that the land was encumbered and later the offer was refused and counsel authorized to prepare a petition to set aside the order of court confirming the final report and discharging the guardian; that the guardian became seriously ill and was taken to the hospital for an operation and, as a result thereof, was critically ill for a long time thereafter, which facts were the causes of the delay in filing this complaint; that, on March 25, 1926, Maurice T. Green and counsel and J. Cyrus Green and counsel met, and a tender of the notes of LaVanche E. Green, together with a demand for cash settlement, was made by counsel of Maurice T. Green to his guardian; that the tender and settlement were both refused and the notes were delivered to the clerk of the court on filing this complaint. Prayer is then made to set aside the final report and to compel the guardian to pay into court the funds due Maurice T. Green with interest.

The second paragraph of answer alleged: That J. Cyrus Green was appointed and acted as guardian of Maurice T. Green as aforesaid, and he served as such until he was discharged by the court on September 7, 1925; that Maurice T. Green arrived at the age of 21 years on April 3, 1924 and that, on June 16, 1925, a report of final settlement was prepared; that, on June 16, 1925, the guardian called on Maurice T. Green and told him that he was going to file a final report in full and final settlement of the trust as guardian; that he had with him such report, duly signed and sworn to by him as guardian, and he did then and there fully and in all things explain the contents of the final report, and did then and there give the same to Maurice T. Green for his own inspection and examination; that Maurice T. Green did then and there read all of the final report and, after so doing, did then and there say that the report was all right and satisfactory to him in every respect and that he would

accept the four notes of LaVanche E. Green, mentioned and described in the final report, as and for the balance due him in final settlement of the trust; that Maurice T. Green did then and there execute the receipt for the four notes, which receipt was filed with and made a part of the final report; that Maurice T. Green did then and there execute the writing which was made a part of said final report and attached thereto, which writing reads as follows: "State of Indiana, Rush County, SS: To Will M. Sparks, Judge Rush Circuit Court, Rushville, Indiana: This certifies that I, Maurice T. Green am more than twenty-one years of age and that I have examined the report of J. Cyrus Green, as my guardian and I ask the Judge of Rush Circuit Court to approve same as the final report of my said guardian. Witness my hand this 16th day of June, 1925. (Signed) Maurice T. Green"; that, on July 9, 1925, J. Cyrus Green filed the final report, with the statement of Maurice T. Green attached, in the Rush Circuit Court and, on September 7, 1925, the final report was submitted to Will M. Sparks, sole judge of the Rush Circuit Court, and, after examining said final report, the same was in all things approved and the court so ordered the same approved, and the guardian was fully and finally discharged from his trust; that LaVanche E. Green is the mother of Maurice T. Green and that he was in all things fully informed and had full knowledge of the financial condition of his mother at the time he received her notes and at the time he signed the written statement accompanying the final report; that Maurice T. Green was of the full age of 21 years and he fully ratified and confirmed the acts of his guardian, and J. Cyrus Green, as such guardian, relying on the statements and representations of Maurice T. Green, filed the final report in settlement of his trust and prayed for its approval by the Rush Circuit Court; that,

by reason of the premises and thereby, all the matters in controversy were included in final settlement.

The specification in the motion for new trial, to wit: "The court erred in denying plaintiff's petition to set aside the guardian's final report in this cause," is not properly an independent specification.

Therefore, the sole question for this court to determine is: Is the decision of the court sustained by sufficient evidence and is it contrary to law?

In considering this question, we need only consider the evidence most favorable to appellee, and if there is any evidence to support such decision, the case must be affirmed.

Maurice T. Green testified: That LaVanche E. Green was his mother and J. Cyrus Green, guardian, was his brother; that he, Maurice, signed a request to have his brother appointed guardian, also he signed some receipts to current reports filed in the guardianship matters; that he did not remember signing the request to the court to accept the final report, but "I can't say positive, it might be my signature, I don't know, I wouldn't say that it is or is not"; that, at the time the guardian brought the final report to him, he was "something like" 22 years, two months and approximately 12 days old, and had been married for several years; that, when he was 21 years old, he knew he was entitled to have the guardianship closed and the assets paid to him, and that he never made a demand on the guardian to close the guardianship nor on his mother for the payment of the notes; that he put the four notes in his pocket and thought that he later took them to the office and placed them in the safe, they were there for a while and he never looked at them; that he was told his father left considerable indebtedness when he died, and he knew his mother had borrowed the guardianship funds shortly after the guardian was appointed; that he could read and write and there was

nothing to prevent him from reading, and he was capable of understanding the final report or any other paper and that he attended to his own financial affairs.

LaVanche E. Green gave evidence to the effect that all the money evidenced by the notes was used to pay her husband's debts, and that none of it went to J. Cyrus Green personally; that she informed Maurice T. Green of the indebtedness and that it had to be paid; that "my sons said they wanted it applied on the indebtedness to keep this from the public"; and that she told her sons that the father had said, shortly before he died, that the insurance should have been made to her, that he did not know what would become of her, and he wished "Cy" was home that day to do it.

Mary Green, wife of Maurice T. Green, identified the signature on the receipt attached to the final report as being that of her husband, but said the signature on the request to the court was not his; and further that she was present when her husband's deposition was taken and that he took a "neutral position" as to the signature on the request to the court being his.

There was evidence to the effect that the final report, the receipt and the request to the court were drawn in an attorney's office and that blanks were left for the signature of Maurice T. Green; that these papers looked the same to the witness on the day of trial as they did when he delivered them to the guardian, except that the dates, signature, etc., were filled in.

Mary L. Green, wife of J. Cyrus Green, said that she was present when her husband presented the final report, the receipt and the request to the court to Maurice T. Green; that "he (Maurice T. Green) read it through" and "signed some papers, but I didn't see just what they were."

J. Cyrus Green testified: That his father's insurance was payable, $8,000 to Maurice T. Green, $6,000 to

himself and $2,000 to his mother; that practically all of the total of this money went to pay the father's debts, which debts were in the name of his mother, LaVanche E. Green; that Maurice wanted the honor of his father preserved and was willing to have his money used to pay the obligations; that he talked it over with Maurice at various times; that he presented the report, with the receipt and request to the court attached, to Maurice T. Green and "he read them and signed them," that "he read this report and read it through and signed it"; that Maurice T. Green also filled in the date of his birth where a blank was left for that purpose, as he (Cyrus) did not know exactly when Maurice was born; that he told Maurice and his wife that he had heard that Joe Green (father-in-law of Maurice T. Green) said he was going to see that the matter was opened up and that Maurice got his money, whereupon, Maurice said it was none of Joe Green's business.

Thomas K. Mull testified that J. Cyrus Green and Maurice T. Green came to his office and, at that time, they said that "they had been talking to their mother and, among other things, about their father's debts and this life insurance and they felt that the life insurance had been left to them and they wanted to apply the insurance in payment of debts of the father and mother."

The evidence disclosed that Maurice T. Green worked in the ticket office of the terminal building at Indianapolis, starting in 1921; that, while employed there for two and a half years, he lived with his mother until he married, when he and his wife lived with his mother; that he then left and went to Marion, Indiana, where they continued to live together a part of the time, using the mother's household furniture, and where he was agent for the Union Traction Company, selling tickets, looking after express and having charge of the office;

that, after being in Marion for about two and a half years, he returned to Indianapolis and "handled the ticket end" at the traction terminal building, where he was employed until July 19, 1928.

Appellant relies on the case of *National Surety Co.* v. *State* (1913), 181 Ind. 54, 103 N. E. 105, to sustain her contention, quoting the language there used, in part, as follows: "What constitutes a ratification by an infant on arriving at his majority is a mixed question of law and fact which is relative in character, and its solution depends somewhat on the nature of the transaction in which it is sought to be established, and on the relationship of the parties thereto. For example, in an action between guardian and ward, stronger and more convincing proof of ratification will be required to bind the minor, than will be necessary to show the affirmance at majority, of a simple contract made during minority by the infant himself. However careful the law may be to protect a minor in his dealings with persons generally, it is even more zealous to defend him in transactions with one who bears a fiduciary relation toward him. . . . A guardianship is a trust of the most sacred character, in which the guardian, or trustee, acts for one whom the law regards as unable to act for himself. He is given certain broad powers with reference to the care and management of the trust property and, although not charged with the exercise therein of greater diligence and prudence than an ordinarily prudent man exercises in his own affairs of a like nature, he is expected to manage the estate to the best interest of the ward and be prepared to pay over the same to the ward when the latter arrives at majority. The ward at that time has the legal right himself to settle the accounts of the guardianship with the guardian, to ratify the acts of the latter with respect to the trust estate and to release him from further liability. But the law looks

with disfavor on settlements of this character, especially when made shortly after the ward becomes of age, and if the transaction is subsequently attacked by the ward, the law presumes fraud, on the ground of public policy, and throws the burden of rebutting that presumption on the guardian. . . . Courts of equity 'will not permit transactions between guardians and wards to stand, even when the minority has ceased and the relation becomes thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the terms, the fullest deliberation on the part of the ward, and the most abundant good faith . . . on the part of the guardian.'" We quote further the language there used: "To overcome this presumption and sustain a private settlement with his ward, the guardian is required to show that he fully and clearly disclosed to the ward the condition of his estate at the time of settlement, that the settlement was fair and equitable, and that at the time it was entered into, the ward acted voluntarily and with full knowledge of all the facts and the law relating thereto." We heartily approve this statement as the law applicable to and governing guardianships. There, the lower court found, and the facts were shown to be, that the guardian made incomplete reports, commingled the ward's money with her own, bought real estate in her own name, made loans and took mortgages in her own name, all without court orders; that a business was purchased before the ward's majority and the *next day*, he agreed to take a one-half interest therein; and that "the agreement of the relator on reaching his majority to become a member of said firm was made without any investigation of the books or affairs thereof and without any knowledge thereof on his part, except such as he had acquired in participating in the management of the business"; and that, when the ward learned of the financial condition of the business,

he informed the guardian that he wanted the money instead of the business interest. It is not necessary to dwell further on this case. Suffice it to say that, under the facts as there presented, the court could only conclude that the condition of the estate was not "fully and clearly disclosed to the ward," and that the ward did not act "voluntarily and with full knowledge of all the facts and the law relating thereto." In the case at bar, such was not the case, as the trial court so found, and there is evidence to sustain that holding.

Appellant also cites, and lays great stress on, the case of *Line* v. *Lowder* (1890), 122 Ind. 548, 23 N. E. 758. There, again, it was said that "a guardian who makes an informal settlement with, and obtains a release from, his ward, assumes the burden of making it clearly appear that he fully and fairly disclosed the conditions of the ward's estate at the time of the settlement." The further statement that "a loan made in good faith, and in the exercise of ordinary care and prudence, upon security which seemed ample at the time, will not be at the personal risk of the guardian if, on account of changed circumstances or depreciation in values, loss subsequently occurs," has some application to the case now under consideration. At the time Maurice T. Green agreed to take the notes of his mother, he knew the condition of her financial affairs. He participated in various discussions as to the debts to be paid. He also knew, when the final report was filed about three years later, the condition of the mother's estate. During the interval between the time the money was loaned, of which he knew, and the time the final report was signed by him, there is a period of about one year, two months and 12 days, during which time he was of age, and he knew then the financial affairs of his mother, he having actually participated in them previously. He knew during all this time that the money was used to pay the debts,

and that the notes of his mother were executed in lieu of the same, and were in existence. He not only knew this over a period of one year after he was 21 years old, but also at the time he signed the final report and requested the court to accept the same. After acquiescing in the transactions for this period of time, he now suddenly, long after the approval of the final report, decides that the security is not good and that he now will not be bound by the report. This he cannot do. The trial court had a right to hold, from the evidence given, that there was a full disclosure of all the facts to Maurice T. Green; that he knew, and continued to know, that the money was used in payment of debts of the father; that he wanted this done. There is no positive showing that he did or did not believe his mother to be solvent, but he *did know* all the facts as they then existed sufficient to apprise him of the condition of the estate, and that the mother's notes were the security given to him. The trial court was justified in finding that no fraud was practiced, and that Maurice T. Green was capable of knowing the facts. It appears that he had held responsible positions and, so far as shown, had been entirely satisfactory and efficient. He had charge of a ticket office where the responsibility necessarily demanded some business ability. During a part of this time, he lived with his mother and was in a position to know of her affairs. It is reasonable to conclude that, after becoming of age and having the power to ratify and confirm, he was just as capable to do those things and understand them as he was to transact his own business previous to and during that time.

In the case of *Tyner* v. *Hamilton* (1875), 51 Ind. 259, the guardian, in purchasing land for herself, used a note given her as guardian on the sale of her ward's land in payment, and the ward, when he became of age, ratified the purchase as an investment in his estate, and it was

held that such ratification was operative. The court, at page 261, said: "The ratification of the transaction of his guardian by John W. Hamilton, after his majority, with a full knowledge of the facts recited in the release, makes her acts in the premises as effectually his own as if he had been of age at the time, and had done them himself."

In *Clark* v. *Van Court* (1884), 100 Ind. 113, 50 Am. Rep. 774, the court used this language: "Hence the better opinion is that a ratification, made by a person of sound mind, on arriving at his majority, will be held valid, if untainted with fraud or undue influence, though the party making it was not at the time aware that it bound him in law. If, however, the ignorance of the party ratifying be in any way induced by the other side, then the ratification will not be regarded as operative," citing cases. The Supreme Court there disapproved the statement in *Fetrow* v. *Wiseman* (1872), 40 Ind. 148, that "a promise to pay after he has arrived at full age, with a knowledge that he is not liable, will amount to a ratification," holding that it is not necessary that it be "with a knowledge that he is not liable."

In *In re Klunck* (1900), 33 Misc. Rep. 267, 68 N. Y. Supp. 629, the guardian loaned the ward's money and took a note with inadequate security. The ward, on becoming of age, with full knowledge of the facts, and on the advice of her husband and counsel, took the note, demanded payment of the maker and gave the note to an attorney to collect, who retained it. It was there held that the unwarranted investment was ratified and the amount could not be charged against the guardian. See, also, *Hoyt* v. *Dollar Savings Bank* (1919), 231 N. Y. 583, 132 N. E. 897; Id., 187 App. Div. 243, 175 N. Y. Supp. 377.

It is clear, from all the cases cited, that where it appears that there has been a full disclosure of all the facts

and no fraud appears, a ward may ratify the ██ guardian's unauthorized acts, and such ratification will operate to make the guardian's acts effective. The judge of the Rush Circuit Court, after hearing the evidence, concluded that Maurice T. Green knew all the facts concerning the transaction, that no fraud was used in procuring his acquiescence in the same, that he was capable of transacting his own business, and that he, of his own volition, ratified and confirmed and requested the court to accept, all things set out in the final report, and thereby released, and also requested the court to release, J. Cyrus Green, as guardian. After a careful examination of the record, we find an abundance of evidence to sustain that finding, and it cannot, therefore, be disturbed. An appellate tribunal does not weigh the evidence, and, where there is any evidence to sustain the decision of the trial court, the judgment will be affirmed.

Judgment affirmed.